## AFFIDAVIT

Task Force Officer Robert Lukacz, being duly sworn, deposes and says:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.      I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a criminal complaint.  I have been a TFO with the DEA since September 2017.

2.      I have been a full-time police officer since December 1998.  From December 1998 to June 2002, I was employed as a police officer by the City of Portsmouth, New Hampshire.  From June 2002 to July 2003, I was employed as a police officer by the Montgomery County, Maryland Police Department.  In 2003, I returned to New Hampshire.  I have been employed as a police officer by the City of Portsmouth, New Hampshire, from July 2003 to the present.

3.      Since September 2017, I have been assigned as a TFO with DEA's Portsmouth District Office Tactical Diversion Squad ("TDS"), where my primary duties are to investigate the distribution of controlled substances including oxycodone, methamphetamine, heroin, fentanyl, and other substances in violation of state and federal drug laws, including Title 21 United States Code, Sections 841 and 846.

4.      As a DEA TFO, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also

1

reviewed recorded conversations and telephone, financial, and drug records. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

5.      The DEA, along with the United States Attorney's Office for the District of New Hampshire, and the Department of Justice, Criminal Division, are investigating Robert G. Soucy Jr. ("SOUCY") for violations of 21 U.S.C. § 841(a)(1) (illegal drug distribution) (the "TARGET OFFENSES") related to his prescribing of controlled substances from a "clinic" operating out his home, located at 9 Oakes Road, Colebrook, New Hampshire 03576 and other locations, such as from vehicles or at "patient's" homes.

6.      I am personally involved in this investigation along with other federal agents.  The statements contained in this affidavit are based upon a review of both public and private records and interviews conducted by me and other federal agents or witnesses knowledgeable about the facts underlying this investigation.  Because this affidavit is provided for the limited purpose of establishing probable cause for a search warrant, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.

7.      This affidavit is made in support of two separate applications under 18 U.S.C. § 2703(a) and (c) —filed simultaneously—for warrants for records and information associated with: (i) a cellular telephone assigned call number of (603) 731-9880 ("**TARGET ACCOUNT 1**"); and (ii) a cellular telephone assigned call number (646) 357-6773 ("**TARGET ACCOUNT 2**") (as more fully described in Attachment A1 of this affidavit), that is stored at the premises controlled by Cellco Partnership d/b/a as Verizon Wireless ("Verizon"), a wireless telephone service provider

headquartered at 180 Washington Valley Road, Bedminster, NJ 07921 and seize the fruits, evidence, and instrumentalities of criminal conduct (as more fully described in Attachment B1); and (iii) an electronic health records ("EHR") account maintained with NextGen Healthcare ("NextGen" or "**TARGET LOCATION"**), an electronic health records vendor headquartered at 4075 Sorrento Valley Blvd, San Diego, CA 92121 (as more fully described in Attachment A2 of this affidavit), to seize the fruits, evidence, and instrumentalities of criminal conduct (as more fully described in Attachment B2).

8.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that, from in or around January 2020, and continuing through the present, in the District of New Hampshire and elsewhere, SOUCY has committed the TARGET OFFENSES.

9.     As a result, there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES, as described below and in Attachments B1 and B2, are located with information associated with **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** maintained by Verizon, and in SOUCY's EHR account maintained by the **TARGET LOCATION** (NextGen).

## II.     FACTUAL BACKGROUND

### Controlled Substances Act

10.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States.  *See* 21 U.S.C. § 801, *et seq*.  It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law.  *See* 21 U.S.C. § 841(a)(1).  It is similarly a federal offense to conspire to violate Section 841(a)(1).  *See* 21 U.S.C. § 846.  The DEA was established in 1973 to serve as

the primary federal agency responsible for the enforcement of the CSA.

11.     Title 21, United States Code, Section 812 establishes Schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on it.  Such controlled substances are listed in Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.  Controlled substance pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction.

12.     Legitimate transactions involving pharmaceutical controlled substances take place within a "closed system" of distribution established by Congress.  Under the "closed system," Title 21 of the United States Code requires that all legitimate handlers of controlled substances (including manufacturers, distributors, physicians, pharmacies, and researchers) be registered with the DEA and maintain strict accounting for all distribution.

13.     Legitimate distributions of controlled substances are limited by the scope of each type of registration.  Title 21, United States Code, Section 802(21) defines a "Practitioner" to include physicians and other medical professionals licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices or does research to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

14.     Medical professionals, including physicians, must become registered with the Attorney General to be authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense, controlled substances, as long as they comply with requirements under their registration.  21 U.S.C. § 822(b).  Such medical professionals are then assigned a registration

number with the DEA.

15.     To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."   21 C.F.R. § 1306.04(a).   Section 1306.04(a) provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

*Id*.

## Characteristics of Illegal Prescribing Practices

16.     Dosage in one or multiple concurrently prescribed opioids is measured through Morphine Milligram Equivalents ("MME").   MME measures a patient's daily dosage of opioids, based upon a conversion factor of the strength of the opioid (using morphine as a base of 1) and the quantity of the controlled substance prescribed per day.   The U.S. Centers for Disease Control and Prevention ("CDC") have medically determined the relative strength of opioids and made the list publicly available.[1]   For example: a patient who is prescribed and ingests a single milligram of morphine once a day will have a 1 MME over the life of the prescription.   However, a patient who ingests prescribed oxycodone (at a conversion factor of 1.5 MME) in the standard prescription of

---

[1] *See Calculating the Total Daily Dose of Opioids for Safer Dosage*, Centers for Disease Control and Prevention (available at https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf).

5 milligram dose four times a day will have a 30 MME over the life of that prescription. Some medical professionals refer to opioid dosage calculations as MED or MEQ. MME, MED, and MEQ are all interchangeable terms that relate to the same calculation.

17. According to guidance from the CDC, in order to minimize the risk of potential overdose, medical professional prescribing opioids should prescribe the lowest effective dosage. Specifically, the CDC recommends that prescribers carefully consider the benefits and risks of prescribing over 50 MME per day.[2] The CDC guidance explains that many patients do not experience any benefit from increasing a prescription above 50 MME per day. Increase in dosage from 50 MME per day to between 50 and 90 MME per day is associated with minimal improvement in pain intensity and no improvement in functioning. But, as the dosage is over 50 MME per day, the patient is placed at progressively greater risk of opioid misuse, overdose, and death.

18. On August 31, 2016, the U.S. Food and Drug Administration ("FDA") issued notice about the danger of concurrent opioid and benzodiazepine prescribing. In this notice, the FDA explains the dangers of concurrently prescribing opioids, benzodiazepines, and other central nervous system depressants, because concurrent use of these controlled substances can result in coma and even death. The FDA—noting that opioids alone carry serious risks such as abuse, addiction, overdose, and death—also cited multiple studies confirming these findings, including one which concluded that patients are at ten times higher risk of overdose death through concurrent use of opioids and benzodiazepines. The FDA strongly warns practitioners to limit these concurrent prescriptions, dosages, and duration of each drug to the minimum possible, due to the danger of patient harm by concurrent dosages. On November 4, 2022, the CDC further warned

---

[2] *See CDC Clinical Practice Guideline for Prescribing Opioids for Pain*, Centers for Disease Control and Prevention (available at https://www.cdc.gov/mmwr/volumes/71/rr/rr7103a1 htm?s_cid=rr7103a1_w).

practitioners to avoid, "whenever possible," concurrently prescribing opioids and benzodiazepines.[3]

19.     Title 21, United States Code, Section 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law.  Analyzing this issue often turns on the facts of a particular case.  There are nonetheless red flags that are indicative of prescriptions that are not issued for a legitimate medical purpose, some of which are discussed below.

20.     I know through my training and experience, and through consultation with experts in the field, that characteristics of illegal pain management clinics or "pill mills" that dispense controlled substances outside the scope of professional practice and not for a legitimate medical purpose include:

    a.  the clinic accepts cash only, or accepts cash as a main method of payment;

    b.  the patients receive prescriptions for the same or similar combinations of controlled substances;

    c.  the patients receive no physical examination (or a very cursory examination is conducted);

    d.  the doctors at the clinic pre-sign prescriptions for controlled substances;

    e.  the physician prescribes or dispenses an inordinately large quantity of controlled substances;

    f.  the physician prescribes or dispenses dangerous combinations of controlled substances that appear to have little to no legitimate medical purpose or justification;

---

[3] *See id.*

g.  the doctors at the clinic fail to treat patients with anything other than controlled substances (*e.g.*, the clinician never recommends physical therapy, surgery, massage therapy, etc.);

h.  the doctors at the clinic fail to heed warnings about patients by others (insurance companies, pharmacists, family members, or clinicians); and

i.  clinics are not certified or accredited under the appropriate state laws.

### Relevant Controlled Substances

#### Buprenorphine

21.     Buprenorphine is a Schedule III[4] medication approved by the FDA to treat Opioid Use Disorder ("OUD") as a medication-assisted treatment ("MAT").  As with all medications used in MAT, buprenorphine should be prescribed as part of a comprehensive treatment plan that includes counseling and behavioral therapies.  Buprenorphine can be prescribed or dispensed in physician offices.

22.     Buprenorphine is a partial opioid agonist that binds with opioid receptors in the brain that cause reduced pain and feelings of wellbeing.  While buprenorphine isn't a full opioid, it acts like one, causing moderate receptor site activity.  When taken as directed, buprenorphine does not create a euphoric state.

23.     Buprenorphine products approved by the FDA for treatment of OUD include buprenorphine sublingual tablets (Subutex) and buprenorphine sublingual films (Suboxone), among others.  The main difference between Suboxone and Subutex is that Suboxone contains both buprenorphine and naloxone, while Subutex contains only buprenorphine.  Naloxone is an opioid antagonist, which blocks the effects of opioids at the receptor site.  As a result, based on

---

[4] Schedule III controlled substances are drugs with a potential for abuse less than Schedule I and Schedule II, and may lead to moderate to low psychological or physical dependence.

my training and experience, I know that Subutex is more prone to be abused or diverted.

24.     Based on my training and experience, many of the more powerful opioids, such as oxycodone, fentanyl, and methadone, are frequently abused by drug addicts and are highly addictive.  In addition, based on my training and experience, many drug-seeking patients also try to obtain prescriptions for benzodiazepines, such as alprazolam, lorazepam, clonazepam, or diazepam.  I am aware that drug users refer to the combination of an opiate and a benzodiazepine as a "drug cocktail."  I am also aware, based on my training and experience, that the addition of a benzodiazepine to an opiate intensifies the high for the user.  If not monitored closely, the combination of opiates and benzodiazepine can cause death because they can significantly depress the central nervous system.

25.     Based on my training and experience investigating cases of unlawful prescription diversion, I know that a practitioner concurrently prescribing the aforementioned medications in certain combinations or in certain dosages is likely not prescribing for a legitimate medical purpose and is prescribing outside the usual course of professional practice.  Prescribing and issuing these medications around the same time greatly compounds the patient's risk of overdose and death from the prescribed drugs.  Moreover, there is a significant diversion risk of prescribing or issuing these drugs contemporaneously.  These substances serve as "potentiators" for the opioid's euphoric effect to increase the "high" a user may obtain from the opioid and are often sought for this illegitimate purpose.

## Opioids

26.     Opioids are controlled substances that vary from Schedule I to Schedule V, depending on their medical usefulness, abuse potential, safety, and drug dependence profile. Opioids are prescribed by doctors to treat pain, suppress cough, cure diarrhea, and put people to

sleep. Effects depend heavily on the dose, how it's taken, and previous exposure to the drug. Negative effects include slowed physical activity, constriction of the pupils, flushing of the face and neck, constipation, nausea, vomiting, and slowed breathing. As the dose is increased, both the pain relief and the harmful effects become more pronounced. Some of these preparations are so potent that a single dose can be lethal to an inexperienced user.

27. Schedule I narcotics, such as heroin, have no medical use in the U.S. and are illegal to distribute, purchase, or use outside of medical research. In addition, Schedule I controlled substances have a very high potential for abuse and addiction.

28. Schedule II controlled substances have a high abuse/addiction potential, yet there is a current medical use in treatment so long as the clinician practices extreme caution. Schedule II opioids include oxycodone, hydromorphone, fentanyl, methadone, and morphine.

<u>Benzodiazepines</u>

29. Benzodiazepines are Schedule IV[5] depressants that will put a patient to sleep, relieve anxiety and muscle spasms, and prevent seizures. Benzodiazepines share many of the undesirable side effects of opioids, including tolerance and dependence. Individuals abuse depressants to experience euphoria. Depressants are also used with other drugs to add to the other drug's high. When used in combination with opioids, depressants not only add to the opioid's high, but the combination also increases the potential of negative side effects, such as slowed breathing, known as respiratory depression. Some examples of benzodiazepines are Valium (diazepam), Xanax (alprazolam), and Klonopin (clonazepam) as well as lorazepam.

30. Alprazolam, for example, is a generic name for a Schedule IV benzodiazepine

---

[5] Schedule IV controlled substances have less potential for abuse and addiction than Schedule II controlled substances and have a current medical use. Schedule IV controlled substances can still be abused and are dangerous when prescribed simultaneous to other controlled substances.

prescription drug marketed primarily under the brand name Xanax. When used for a legitimate medical purpose, Alprazolam is used to treat such conditions as anxiety, depression, and panic disorder. Alprazolam comes in .25 mg, .5 mg, 1 mg, and 2 mg strengths. The 2 mg tablets are rectangular in shape and are often referred to on the street as "bars" or "zanny bars." Alprazolam can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels.

### Amphetamines

31.     Amphetamines are stimulants, most often used to treat attention-deficit hyperactivity disorder and narcolepsy. Because of their high potential for abuse, many amphetamines are Schedule II stimulants. Prolonged use of amphetamines has a high risk of drug dependence. Misuse of amphetamine can cause serious cardiovascular issues, as well as death.

32.     Dextroamphetamine-amphetamine, for example, is a form of Schedule II stimulant prescription drug. Dextroamphetamine-amphetamine is marked primarily under the brand name Adderall. When used for a legitimate medical purpose, Dextroamphetamine-amphetamine is used to treat such conditions as ADHD and narcolepsy. Dextroamphetamine-amphetamine comes in 5 mg, 7.5 mg, 10 mg, 12.5 mg, 15 mg, 20 mg, and 30 mg tablets and 5 mg, 10 mg, 15 mg, 20, mg, 25 mg, and 30 mg extended-release capsules. Dextroamphetamine-amphetamine can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels.

### **Medical Benefit Programs**

33.     SOUCY is enrolled as a provider with Medicare and other health care benefit programs and purportedly provides medical services to recipients of Medicare and other health care benefit programs, as that term is defined in Title 18, United States Code, Section 24(b).

34.     The Medicare Program ("Medicare") is a federally funded program that provides

free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare are governed by federal statutes and regulations. The Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversees and administers Medicare. Individuals who receive benefits under Medicare were commonly referred to as Medicare "beneficiaries."

35.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

36.     Medicare covers different types of benefits and was separated into different program "parts." Medicare "Part A" covers, among others, health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covers, among other things, medical items and services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, durable medical equipment ("DME"), and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. Medicare "Part C," or "Medicare Advantage," provides Medicare beneficiaries with the option to receive their Medicare benefits (Parts A and B) through a wide variety of private managed care plans. Medicare "Part D" covered, among other things, certain prescription drugs.

37.     Medicare "providers" included physicians and other health care providers who provided items or services to beneficiaries. To bill Medicare, a provider is required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contains certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application

requires the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

38.     A Medicare "provider number" is assigned to a provider upon approval of the provider's Medicare Enrollment Application.  A health care provider that receives a Medicare provider number is able to file claims with Medicare to obtain reimbursement for items or services provided to beneficiaries.

39.     A Medicare claim is required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").  The claim form may be submitted in hard copy or electronically via interstate wire.

40.     When submitting claims to Medicare for reimbursement, providers are required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

41.     Medicare claims are required to be properly documented in accordance with Medicare rules and regulations. Medicare will not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

42.     Submission of a claim to a health care benefit program, whether public or private, involves representations by the provider that the services rendered were of a quality that met professionally recognized standards which include: (1) informed consent; (2) being medically necessary; and (3) being supported by documentation of such necessity.

<u>State of New Hampshire Prescription Drug Monitoring Program</u>

43.     The State of New Hampshire, Department of Health and Human Services administers the Prescription Drug Monitoring Program ("PDMP").  The PDMP is a secure web-based database that is used across the State of New Hampshire to improve public health by providing information about a patient's drug use for medical providers to access prior to prescribing or dispensing those drugs.   Prescription dispensers (such as New Hampshire pharmacies, mail-service pharmacies, remote-dispensing pharmacies, and other dispensers) upload prescribing data to the PDMP.   From there, licensed prescribers (and delegates of licensed prescribers) have access to the PDMP data.   All prescribers and dispensers are required by New Hampshire law to register as data requesters.   For all Schedule II–IV controlled substances, dispensers are required, no later than the close of business on the next business day after dispensing a controlled substance, to submit certain information to the PDMP, such as dates the prescription was filled and delivered, prescription number, the National Drug Code ("NDC") for the drug dispensed, quantity dispensed, dosage, and certain patient identifiers.

## III.     PROBABLE CAUSE TO BELIEVE A CRIME HAS BEEN COMMITTED

44.     SOUCY is a doctor of osteopathic medicine, licensed in New Hampshire.  SOUCY is registered with the DEA (# BS1092612) and presently authorized to issue prescriptions for

controlled substances.  According to his DEA registration, he is registered to prescribe out of the Soucy Residence.

## Analysis of PDMP

45.     As part of the investigation into SOUCY, the government consulted with expert Donald Sullivan, R.Ph., Ph.D. ("Dr. Sullivan").  Dr. Sullivan is a Professor of Pharmacy Practice and Science at the Ohio State University and a Professor of Clinical Pharmacy at the Ohio State University College of Pharmacy, and received his bachelor's, master's, and doctorate degrees from the Ohio State University's College of Pharmacy.  Dr. Sullivan has been teaching pharmacology for more than twenty years.  He has received the P3 Distinguished Teaching Award and the Miriam R. Balshone Award for Distinguished Teaching.  Dr. Sullivan has been published in approximately twenty peer-reviewed publications.  Further, Dr. Sullivan has more than 10 years of experience in reviewing physician prescribing patterns and identifying indicia of illegal prescribing practices. He has reviewed more than 800,000 prescriptions from prescribing practitioners for red flags of drug diversion and abuse of controlled substances.  He also conducted educational classes on illegal prescribing, prescription drug diversion, and the prescribing and dispending of controlled substances.

46.     As part of the investigation, Dr. Sullivan reviewed returns from the New Hampshire PDMP containing records of approximately 1,864 controlled substances prescriptions SOUCY issued from on or about November 18, 2020, through on or about April 20, 2023.  Dr. Sullivan notes several red flags indicative of SOUCY prescribing controlled substances outside the usual course of professional practice and not for a legitimate medical purposes, such as prescribing:

    a.  opioids and benzodiazepines together;

    b.  extremely high doses of opioids, specifically oxycodone, methadone, and fentanyl;

   c.   controlled substances to patients living at the same address;

   d.   buprenorphine, a benzodiazepine, and a stimulant—a combination known to be
        abused and/or diverted;

   e.   fentanyl patches every two days instead of every three days;

   f.   the "holy trinity" combination of controlled substances (narcotic pain killer,
        benzodiazepine, and carisoprodol), a combination known to be abused and/or
        diverted;

   g.   a narcotic pain killer, benzodiazepine, and a stimulant, a combination known to be
        abused and/or diverted;

   h.   two immediate release narcotic pain killers at the same time; and

   i.   opioids with MME significantly above the CDC recommended threshold of 50.

47.     According to Dr. Sullivan, the prescribing of an opioid with a benzodiazepine has
been a well-known combination of drugs abused and diverted for several years.  This combination
is also very dangerous.  It places the patient at a heightened risk for overdose.  As set forth above,
in 2016 after extensive review of the latest scientific evidence, the FDA announced that it was
requiring changes to the drug labeling, including patient information, to help inform health care
providers and patients of the serious risks associated with the combined use of opioid medications
and benzodiazepines.  These changes included the FDA requiring boxed warnings—the FDA's
strongest warning—and patient-focused Medication Guides for prescription opioid analgesics,
opioid-containing cough products, and benzodiazepines.  This included information about the
serious risks associated with using these medications at the same time.  These risks include extreme
sleepiness, respiratory depression, coma, and death.  Shortly after this announcement, most
prescribing of this combination ceased.  However, some prescribers—such as SOUCY—continue

to issue prescriptions for opioids and benzodiazepines to be taken concurrently to patients who are known to be abusing and/or diverting them.  SOUCY prescribed a combination of an opioid and a benzodiazepine to several patients.  These prescriptions were likely not for a legitimate medical purpose and prescribed to patients abusing and/or diverting them.  These patients included Patient #1.

48.     Additionally, Dr. Sullivan found that, according to PDMP records, SOUCY has prescribed fentanyl, oxycodone, diazepam, alprazolam, and lorazepam to Patient #1[6], at times resulting in an MME of 990—***which is ten times the CDC's recommended dosage***.  Dr. Sullivan found multiple red flags with SOUCY's prescriptions to Patient #1, including that he prescribed a fentanyl 100mcg patch to be applied once a day.  Fentanyl patches are a three-day, sustained-release patch that provides the drug continuously to the patient for 72 hours.  These patches are available in several dosage strengths, with 100mcg being the strongest available.  In rare instances, a fentanyl patch may be prescribed every two days.  Fentanyl is a very potent narcotic pain killer and can cause overdose very easily.  When a prescription is written for ten patches, this constitutes a 30-day supply.  But, Dr. Sullivan observed that SOUCY prescribed fentanyl patches to three patients, including Patient #1, to be used every one to two days.  For example, Dr. Sullivan noted that SOUCY prescribed forty-nine fentanyl 100mcg patches for Patient #1 in an eight-day period in January 2023, and fifty-eight fentanyl 100mcg patches for Patient #1 in a 12-day period in February 2023.  When a physician writes a prescription for more than one patch every three days, this constitutes overprescribing.  This is red flag that the patient is abusing and/or diverting the fentanyl.

49.     For Patient #1, SOUCY also prescribed oxycodone in combination with the high

---

[6] According to the PDMP records, which dated back to November 18, 2020, the first date of a SOUCY prescription to Patient #1 was October 28, 2021, an oxycodone prescription.

dosage of fentanyl. Specifically, SOUCY prescribed Patient #1 a 30mg tablet of oxycodone at a dose of 12 tablets per day. Dr. Sullivan noted, "[t]his is the highest dose of oxycodone 30mg [he had] ever seen prescribed." According to Dr. Sullivan, if this patient were taking these drugs as prescribed, "it is impossible for the patient to not overdose," and, instead, opined that it is likely the patient was diverting the controlled substances.

50. Patient #1 also received benzodiazepines to be taken multiple times daily. Dr. Sullivan opined that that "[t]here is no therapeutic rational for the patient to be prescribed three benzodiazepines at the same [time]" and that this was indicative of Patient #1 diverting the medication. Dr. Sullivan noted that four of the five drugs prescribed were prescribed at the highest recommended dosage resulting in an "extraordinary high MME," and further opined that if Patient # 1 was not diverting the medication, it "placed the patient at imminent risk for an overdose."

51. In analyzing all of the prescriptions SOUCY wrote for Patient #1, Dr. Sullivan concluded "[t]his is the worst combination of controlled substances and doses I have ever seen prescribed for abuse and/or diversion."

52. Further, Dr. Sullivan noted that SOUCY's prescribing practices for the below patients were outside the unusual course of professional practice and without a legitimate medical purpose:

| Patient | Controlled Substances Prescribed |
|---|---|
| Patient #1 | Fentanyl; Oxycodone; Diazepam; Alprazolam; Lorazepam |
| Patient #2 | Fentanyl; Oxycodone; Methadone |
| Patient #3 | Oxycodone; Methadone |
| Patient #4 | Oxycodone |
| Patient #5 | Oxycodone; Clonazepam; Carisoprodol |
| Patient #6 | Methadone; Morphine |
| Patient #7 | Methadone; Clonazepam; Alprazolam; Dextroamphetamine-amphetamine |
| Patient #8 | Oxycodone; Lorazepam |
| Patient #9 | Methadone; Tramadol |
| Patient #10 | Chlordiazepoxide |

| Patient #11 | Methadone; Clonazepam |
| Patient #12 | Oxycodone |
| Patient #13 | Chlordiazepoxide |
| Patient #14 | Buprenorphine; Dextroamphetamine-amphetamine; Clonazepam |

**Pharmacist Interviews**

*Walgreens (Concord)*

53.     On November 17, 2022, a diversion investigator at the DEA received a complaint from Pharmacist #1 at the Walgreens Pharmacy located in Concord, New Hampshire[7] reporting that SOUCY and Patient #1 arrived at the Pharmacy window together attempting to fill four handwritten prescriptions for (i) thirty 100mcg fentanyl patches, (ii) 180 oxycodone 30mg tablets, (iii) 270 5mg lorazepam tablets, and (iv) an unknown quantity of 2mg diazepam tablets.  The two benzodiazepine prescriptions (lorazepam and diazepam) had five refills each.   Walgreens refused to fill the prescriptions.  SOUCY and Patient #1 informed Pharmacist #1 that they had been driving around for four hours attempting to fill the prescriptions at different pharmacies.

54.     DEA investigators spoke to Pharmacist Tech #1, who was also present for the interaction with SOUCY and Patient #1 at the Walgreens in Concord.  Pharmacist Tech #1 informed Patient #1 that the pharmacy did not carry 100mcg fentanyl patches.  At that point, Patient #1 called out, "doc," and SOUCY emerged from wandering through the aisles.  After being informed that the pharmacy didn't carry fentanyl in that dosage, SOUCY stated he would "change it to 50mcg fentanyl patches," with "it" referring to the handwritten prescription.  Ultimately, the pharmacist at Walgreens refused to fill the prescription.

55.     DEA investigators obtained surveillance footage from the Walgreens in Concord

---

[7] The pharmacy is located about three and half hours away from Monroe, Maine, where Patient #1 is a resident and about two hours away from the Soucy Residence.

dated November 11, 2022.  The footage appears to document SOUCY and Patient #1 enter the store at approximately 3:12 p.m. and walk to the pharmacy counter.  There, Patient #1 and SOUCY interact with employees at the pharmacy counter.

*North Country Healthcare Pharmacy (Colebrook)*

56.     On February 9, 2023, DEA investigators interviewed Pharmacist #2, who worked at the North Country Healthcare Pharmacy in Colebrook, New Hampshire.  Pharmacist #2 opined that SOUCY was "a horrible problem" and that he prescribes large amounts of stimulants and benzodiazepines.   Pharmacist #2 explained that SOUCY dropped off the prescriptions himself to the pharmacy on behalf of his patients.   Pharmacist #2 also stated that SOUCY visited the pharmacy with Patient #1, but, as of January 2023, North County Healthcare Pharmacy refused to fill prescriptions for Patient #1.  Pharmacist #2 stated that all of SOUCY's prescriptions for Patient #1 were handwritten, but SOUCY does submit electronic prescriptions for some of his other patients.   Pharmacist #2 stated that New Hampshire law requires that all providers submit electronic prescriptions for controlled substances, but SOUCY often does not comply.   Pharmacist #2 was aware that SOUCY issued prescriptions for fentanyl patches, hydromorphone, oxycodone, and three benzodiazepines all at once.  At that time, Pharmacist #2 had noticed that SOUCY had been increasing the dosage in his prescriptions of the past few months.  Pharmacist #2 also observed that when SOUCY's patients were unable to fill fentanyl prescriptions, SOUCY would issue prescriptions for Dilaudid (a brand name for the opioid hydromorphone).  Pharmacist #2 also stated that SOUCY attempted to fill prescriptions for his patients at the end of the day, which Pharmacist #2 believed was done in an effort to pressure the pharmacist to fill the prescription.

*Walgreens (Colebrook)*

57.     On February 9, 2023, DEA investigators interviewed Pharmacist #3, who worked

at the Walgreens in Colebrook, New Hampshire.  Pharmacist #3 explained that she was familiar

with SOUCY and that Walgreens placed Patient #1 on a do not fill list.  Pharmacist #3 stated that

SOUCY prescribed "too much" and that his patients often attempted to fill prescriptions early.

Pharmacist #3 stated that SOUCY delivered the prescriptions for his patients to the pharmacy and

had on occasion picked up the prescriptions for his patients.  Pharmacist #3 suspected that SOUCY

issued prescriptions out of his vehicle and that he may have a printer in the car, but Pharmacist #3

did not provide further information regarding that supposition.  Pharmacist #3 stated SOUCY does

drop off multiple prescriptions each day.  Pharmacist #3 observed that SOUCY issued duplicate

prescriptions to the same patient, for the same drug, on the same day.   In those instances,

Pharmacist #3 suspected SOUCY may not have remembered that he had already issued the

prescription and then he wrote a second prescription accidentally.  Pharmacist #3 also stated

SOUCY does not take insurance payments, only cash, and that he also made house calls to his

patients.[8]  Pharmacist #3 also explained that his prescription pad listed the Soucy Residence as the

address of his practice.

58.     Pharmacist #3 further explained that SOUCY treated inmates at the Coos County

Jail and that many of his patients are former inmates.  Pharmacist #3 also overheard a conversation

from one of SOUCY's patients attempting to pick up a prescription at the pharmacy.   The

pharmacy did not have a record of the prescription, so the patient immediately called SOUCY and

stated, "Hey Bob, you were supposed to be here to drop off a script for me."  On other occasions,

Pharmacist #3 also observed SOUCY accompany former Coos County Jail inmates into the

---

[8] Medicare Part D data reflects that from on or about January 1, 2020, to on or about April 7, 2023, SOUCY caused Medicare to pay approximately $118,169.79 to pharmacies in connection with approximately 2,879 prescriptions he issued to approximately 141 Medicare beneficiaries (in total).  However, according to Medicare Part B data from that same time period, SOUCY did not submit any billings to Medicare Part B for his physician services allegedly performed in connection with those prescriptions.  Based on my training and experience, this discrepancy between SOUCY's Medicare Part B and D data suggests that SOUCY was accepting cash as a form of payment instead of billing Medicare for his services.

pharmacy.

*Rite Aid (Littleton)*

59.     On February 9, 2023, DEA investigators interviewed Pharmacist #4, who worked at the Rite Aid Pharmacy in Littleton, New Hampshire.  Pharmacist #4 recalled that in or around January 2023, SOUCY dropped off a prescription for Patient #1 for fentanyl patches and stated that he would take any brand as the patient was having a hard timing filling the prescription. Pharmacist #4 filled the prescription, but she noticed it was a dosage decrease for Patient #1. (According to PDMP records, on December 3, 2022, that Rite Aid pharmacy filled a fentanyl 50mcg prescription issued to Patient #1.  This may be the instance Pharmacist #4 recalled.)

60.     Pharmacist #4 also stated that SOUCY and Patient #1 returned to the pharmacy at a later date in January 2023 to fill a prescription for fentanyl 100mcg patches, but the pharmacy did not have any in stock.  The next time SOUCY and Patient #1 came into the pharmacy, Pharmacist #4 requested diagnosis and supplemental paperwork to justify the increase in dosage from 50mcg to 100mcg.  Patient #1 did not produce the requested paperwork and Pharmacist #4 refused to fill the prescription.

61.     On February 9, 2023, DEA diversion investigators interviewed Pharmacist #5, who also worked at the Rite Aid Pharmacy in Littleton.  Pharmacist #5 informed investigators that, on January 5, 2023, SOUCY phoned the pharmacy to inquire as to how many fentanyl 100mcg patches were in stock and Pharmacist #5 informed SOUCY that the pharmacy did not have much of the drug in stock.   On January 7, 2023, both SOUCY and Patient #1 visited the pharmacy and attempted to fill a prescription for fentanyl 100mcg patches.  Pharmacist #5 did not fill the prescription because the pharmacy was out of stock.  On January 11, 2023, SOUCY phoned the pharmacy and asked, "did you get the fentanyl in?", to which Pharmacist #5 responded, "no."

SOUCY stated, "are you fucking kidding me?" and hung up the phone.

62.     On February 3, 2023, SOUCY and Patient #1 again visited the pharmacy and presented handwritten prescriptions for (i) 180 tablets of hydromorphone 4mg and (ii) an unknown amount of fentanyl 100mcg patches.   That evening at approximately 7:00 p.m., SOUCY and Patient #1 returned to pick up the prescription.   Pharmacist #5 refused to fill the prescription. SOUCY stated that he and Patient #1 had submitted the prescription to a mail order pharmacy, but it would take three weeks to fill.  Despite feeling pressured by SOUCY and Patient #1 to fill the prescription, Pharmacist #5 refused.    Pharmacist #5 informed the DEA that Patient #1 was subsequently placed on a refusal to fill list.

63.     According to PDMP records, on January 23, 2023 (eleven days prior to this interaction), SOUCY issued a prescription to Patient #1 for 34 fentanyl 100mcg patches, which was filled on February 2, 2023, by ESI Mail Pharmacy Service located in Tempe, Arizona. Presumably, this was the mail-ordered prescription SOUCY referenced to Pharmacist #5.

64.     On March 23, 2023, a DEA diversion investigator was conducting an audit on site at Rite Aid Pharmacy located in Littleton, New Hampshire.  During the audit, DEA investigators asked Pharmacist #6 about her recent interactions with SOUCY.  Pharmacist #6 informed the DEA that Patient #1 called the pharmacy to inquire about the status of prescriptions SOUCY had issued and Pharmacist #6 responded that the pharmacy refused to fill any of Patient #1's prescriptions because he/she did not provide documentation related to his/her diagnoses, as previously requested by the pharmacy.  Patient #1 informed Pharmacist #6 that he/she ordered the same prescriptions from an online pharmacy and was waiting on the delivery.  Pharmacist #6 agreed to partially fill one of the prescriptions "to get [him/her] through" until he/she was able to receive the shipment from an online pharmacy.  Patient #1 then told Pharmacist #6 "not to let [SOUCY] pick up" his/her

prescriptions.  Coincidentally, as DEA investigators were on site, SOUCY entered the pharmacy. SOUCY requested to fill Patient #1 prescriptions, but Pharmacist #6 refused and informed SOUCY that Patient #1 was on a "do not fill list."  SOUCY exited the pharmacy.

### Former Patient Interview

65.     On April 19, 2023, a DEA diversion investigator interviewed Former Patient #1, a former patient of SOUCY.  At the time of the interview, Former Patient #1 was in the custody of the Colebrook, New Hampshire Police following his/her arrest in an unrelated drug investigation. Former Patient #1 stated he/she had been a patient of SOUCY's "years ago" and that "I've known [SOUCY] forever, he's been up here forever, he's the jail doctor, he prescribes to a lot of my friends."  Former Patient #1 reported that SOUCY had previously prescribed carisoprodol (Soma) and buprenorphine (Suboxone) to him/her.[9]  Former Patient #1 stated that the carisoprodol was for muscle spasms and migraines and the Suboxone was for drug dependency, but SOUCY had said to him/her, "hey take these and give them out to your friends."

66.     Former Patient #1 stated that his/her appointments with SOUCY were at SOUCY's office but that he/she has friends who have gone to the Soucy Residence for appointments.[10] Former Patient #1 identified these friends by their first names, who investigators believe to be Patient #7 and Patient #14, both of whom have been identified through the New Hampshire PDMP as individuals who have received prescriptions from SOUCY.  In discussing patients going to the Soucy Residence, Former Patient #1 stated, "basically from my understanding you bring him a hundred bucks and he won't even write your scripts up if you don't bring him a hundred bucks.  If you don't have the money he won't give it to you…he's a drug dealer."  Former Patient #1

---

[9] PDMP data from approximately November 18, 2020, through April 20, 2023, reflects that SOUCY issued Former Patient #1 prescriptions in March 2022 for Buprenorphine and Carisoprodol.
[10] Former Patient #1 did not indicate where SOUCY's office was located at the time he/she met with him.

specifically stated Patient #14 "gets Adderall and Ritalin, benzos, if you don't have the hundred bucks he won't write it."

67.    Former Patient #1 stated that Patient #7 went to the Soucy Residence to meet SOUCY, and that patients "go in and it's like a home office, [Patient #7] goes over and visits him like it's his buddy."  Former Patient #1 also stated that SOUCY will also make house calls to patient's residences.  Former Patient #1 stated that SOUCY issued him/her paper prescriptions and that SOUCY "will drop [prescriptions] off for people, for [Patient #14] he will drop them off for him."  Former Patient #1 stated that SOUCY did this because he is "a drug dealer."  According to Former Patient #1, SOUCY will ask patients what type of drugs they want.  Former Patient #1 also described that SOUCY prescribed Patient #7 methadone for pain but SOUCY is actually prescribing it for substance abuse treatment.[11]  Former Patient #1 stated, "it's for treatment but he writes it for pain so he doesn't get in trouble."  Former Patient #1 stated that SOUCY had told him/her, "I'll up your dose but I can't do it, what I'm doing is illegal, I'm not supposed to prescribe for treatment, it's for pain."  Former Patient #1 stated that he/she knew SOUCY to live in a rural area and described him as a loner.

68.    On May 17, 2023, DEA agents surveilled SOUCY leave his residence and travel around the Colebrook area.  During this surveillance, DEA agents surveilled SOUCY enter a trailer park, park his vehicle, exit, and meet with Patient #7.  During this short interaction, DEA agents observed SOUCY exchange what appeared to be a white piece of paper with Patient #7.  DEA agents suspect they observed SOUCY deliver a prescription to Patient #7 but have not confirmed that.  Investigators have not reviewed updated PDMP data to determine if SOUCY issued a

---

[11] With some exceptions, Methadone must be dispensed at certified opioid treatment programs (commonly referred to as "methadone clinics") if prescribed for opioid use disorders.  If prescribed for pain, most pharmacies, before filing the prescription, require that the prescription indicate that the drug is being prescribed for pain management.

prescription to Patient #7 on that date.

### Execution of Search Warrant at SOUCY's Residence

69.     On May 23, 2023, this Honorable Court authorized a search warrant for

SOUCY's residence, 9 Oakes Road, Colebrook, New Hampshire (case # 23-mj-98-AJ).  On May

24, 2023, the warrant was executed.  During the search, DEA investigators located three empty

prescription bottles that had labeling indicating that they were prescriptions that SOUCY wrote

for Patient #1.  One empty bottle was for Oxycodone, and the other two empty bottles were for

Diazepam.  The bottles were located in what appeared to be an office off the dining room on the

first floor of the residence.

70.     DEA investigators asked SOUCY why he would have these pill bottles in his

residence, and SOUCY responded that he needed the bottles to reference the fill dates of the

prescriptions for Patient #1, as Patient #1 was transitioning to a new mail-order pharmacy.

### Execution of Search Warrant of SOUCY's Phone

71.     On May 23, 2023, this Honorable Court authorized a search warrant for SOUCY's

cellular telephone (case # 23-mj-99-AJ).  On May 24, 2023, DEA investigators seized SOUCY's

cellular telephone pursuant to the warrant.  While the contents of the data extracted from SOUCY's

cellular telephone are still being reviewed, so far, DEA investigators have located entries from the

phone's calendar which appear to document that SOUCY and Patient #1 traveled to Concord in

order to obtain medication.  For example, there is an entry dated November 12, 2022, which states

"Drive to Concord w (sic) [Patient #1's first name]."  Likewise, there is an entry dated November

13, 2022, with a subject that reads "[Patient #1] meds pick up@OSCO (sic)" and the details for

the entry state, "went to Concord to try and pick up [Patient #1's first name] meds+ (sic) market

basket."  Additionally, there is an entry dated February 8, 2023, with the same subject and details

as the November 13, 2022 entry.

**Interviews of SOUCY**

72.    On May 24, 2023, DEA investigators interviewed SOUCY at his residence in

Colebrook, New Hampshire during the execution of a search warrant of the house.  The interaction

was recorded.  Investigators provided SOUCY with his *Miranda* rights, which SOUCY waived.

SOUCY stated that he is a family practitioner and estimated that he currently treats 100 patients,

a "good chunk" of which he inherited from another doctor and described these patients  as a "pain

in the ass."  SOUCY explained these inherited patients were a pain because "people on chronic

pain meds, some of them lie."

73.    While SOUCY stated that he conducted most of his business at an office that he

rented in downtown Colebrook, he acknowledged that he sometimes sees patients at his house.  He

elaborated that he sees patients in his garage or in their car.  SOUCY explained that he gets into

patient's cars and checks their blood pressure.  Most of SOUCY's records are stored in a computer.

74.    SOUCY described Patient #1 as suffering from combat related injuries and stated

that Patient #1 is "my biggest problem patient."  According to SOUCY, Patient #1 is in constant

pain and demands "an inordinate amount of pain medication as well as benzodiazepines." Patient

#1 has the biggest tolerance that SOUCY has ever seen.  SOUCY indicated that Patient #1 is on

oxycodone, two benzodiazepines, and 100 microgram fentanyl patches.  SOUCY blamed Patient

#1's prior doctor for the levels of Patient #1's prescriptions.  SOUCY explained that Patient #1 is

"very tricky because [he/she's] always taking one thing or another."  SOUCY said that Patient #1

"doesn't overdose, but [he/she] went into two withdrawals here in the last to weeks because of the

lack of oxycodone federally."

75.    SOUCY described an incident where he went into the Rite Aid in Littleton with

Patient #1 to pick up medicine and the pharmacist refused to fill the prescriptions for Patient #1's controlled substances because the pharmacist was not comfortable. SOUCY said that he told the pharmacist that if they were not comfortable filling the prescriptions that was fine. SOUCY admitted to DEA investigators that he knows that Patient #1 is "getting too much" but stated that Patient #1 uses the medicine and does not sell it.

76.     SOUCY suspects that maybe four of his patients are diverting their controlled substance prescriptions. SOUCY stated that Patient #9 is on a "shitload of methadone" and might be giving the methadone to a family member.

77.     SOUCY used to conduct urine drug screens on his patients to monitor them but is not currently doing so because he is "out of cups right now."

78.     SOUCY does not take insurance and instead charges $100 cash up to one hour for every visit. He explained that insurance requires too much paperwork and since he operates by himself, he doesn't have time for insurance paperwork.

79.     On June 2, 2023, DEA investigators interviewed SOUCY at his residence. The interaction was recorded. SOUCY stated that he uses MediTouch by the **TARGET LOCATION** as his EHR software. He explained that he pays $608 a month for access to MediTouch.

80.     SOUCY stated that at times he feels pressured by Patient #1 to write a prescription for a controlled substance and SOUCY cannot say no to him/her. SOUCY stated that Patient #1 is currently on fentanyl, oxycodone, and benzodiazepine. SOUCY described Patient #1's oxycodone level as "high" and in general the dosages of controlled substances for Patient #1 as "big doses." SOUCY acknowledged that Patient #1 was receiving dosages "leagues and leagues above what is recommended by the CDC." Soucy described Patient #1's tolerance to opioids as "high." SOUCY acknowledged that Patient #1 had been through benzodiazepine withdrawal

28

before and opiate withdrawals twice in the past two months.  SOUCY explained that the pain medicines that are prescribed to Patient #1 are so Patient #1 is "able to get out of bed and move" and for muscle spasms.

81.    SOUCY stated that Patient #6 suffered an injury at work and now has permanent nerve damage.  SOUCY prescribes Patient #6 morphine sulfate and methadone.  SOUCY stated that Patient #6 was "using too much" of "both" and explained that he started cutting back on Patient #6's prescriptions.

82.    SOUCY treats Patient #9 for chronic pain.  He stated that Patient #9 "is on too much methadone" and just this week he told Patient #9 "you're on way too much…Its going to hurt a bit, but you are going to have to get off of it."  SOUCY explained that Patient #9 is "scared to death of going through being dope sick."  SOUCY reiterated his concerns that Patient #9 was sharing his/her prescriptions with their sibling.  SOUCY stated that Patient #9 "came to me on twice as much as I thought [he/she] should be on," which he blamed on Patient #9's former doctor.

83.    SOUCY stated in substance that he has a difficulty saying "no" to patients requests for more prescriptions.  He cited the lack of other prescribers in the area as a contributing factor, and that he "inherited a whole bunch" of patients from another practitioner as a justification.

84.    DEA investigators interviewed SOUCY again on June 30, 2023, at his residence. The interaction was recorded.  SOUCY stated in substance that the only place where he possesses EHR is in the TARGET LOCATION, and that there are not any EHR stored on his computer or personal devices.  SOUCY showed investigators that he had an application on a desktop computer that accesses EHR from TARGET LOCATION.

85.    While talking about the levels of controlled substances that Patient #1 is on, SOUCY stated in substance that he asked around about Patient #1, and was informed that Patient

#1 is not selling his/her prescriptions.  DEA investigators asked SOUCY if he ever drove Patient #1 to Concord, and SOUCY stated in substance that once he drove Patient #1 to a department store in Concord so Patient #1 could buy something.  While they were in Concord, Patient #1 wanted to fill a prescription.  SOUCY told Patient #1 that would not work and Patient #1 said, "well you are my doctor come in with me."  SOUCY thought they went into a Walgreens.  SOUCY recalled that the pharmacist was not comfortable filling the prescription for Patient #1.

86.    DEA investigators asked SOUCY why Patient #1 would call a pharmacy and instruct the pharmacy to not let SOUCY pick up prescriptions for Patient #1.  SOUCY responded in substance that he did not know why.  SOUCY stated in substance that he has picked up syringes for Patient #1 from OscoDrug and Rite Aid[12], but denied picking up other controlled substances for Patient #1.

87.    DEA investigators asked SOUCY again about the pill bottles located in his residence and SOUCY stated in substance that he needed the pill bottles for the fill date to assist Patient #1's transition to a mail-order pharmacy.  SOUCY denied using or trafficking drugs.  At the end of the interaction, SOUCY signed a DEA 104 form, titled "DEA Surrender for Cause of DEA Certificate of Registration," which prohibits SOUCY from prescribing, possessing, dispensing, or administering controlled substances.

**Interview of Patient #1**

88.    On May 24, 2023, DEA investigators interviewed Patient #1 at his/her residence.  DEA investigators observed that while Patient #1 moved slowly, Patient #1 was able to stand upright throughout the interview and possessed very muscular arms and shoulders.  DEA investigators saw a fentanyl patch on Patient #1's right tricep.  When DEA investigators

---

[12] Patient #1 is also prescribed testosterone.

commented to Patient #1 about his/her physique, Patient #1 indicated that he/she does pushups off the couch.

89.    Patient #1 has been seeing SOUCY for about three years, most for pain management as Patient #1 was "blown up" while fighting overseas.  Patient #1 reported that walking is difficult without fentanyl and he/she needs opioids to function.

90.    Patient #1 has gone to SOUCY's house for medical visits, and SOUCY has come to Patient #1's residence as well.  Patient #1 sees SOUCY about once a month and most of the time SOUCY just calls in prescriptions for Patient #1.  Patient #1 admitted that occasionally SOUCY has driven him/her around to pick up prescriptions when his/her vehicle is not working.  Patient #1 denied ever driving to Concord with SOUCY and stated that the farthest Patient #1 drove with SOUCY to get medication was only Littleton.

91.    Patient #1 stated that often he/she has leftover medication at the end of each month, but he/she "only takes what is needed."  SOUCY charges Patient #1 $45.00 cash for each appointment.

### IV.    PROBABLE CAUSE TO BELIEVE EVIDENCE OF THE TARGET OFFENSES IS WITHIN INFORMATION ASSOCIATED TARGET ACCOUNT 1 AND TARGET ACCOUNT 2 MAINTAINED BY VERIZON.

92.    Based on the above and below facts, there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES, as described below and in Attachments B1 and B2, are located with information associated with **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** maintained by Verizon.

93.    Investigators obtained records from Verizon for **TARGET ACCOUNT 1** via grand jury subpoena.  As of November 18, 2011, SOUCY is listed as the subscriber for the phone number associated with **TARGET ACCOUNT 1.**

94.     Likewise, investigators obtained records from Verizon for **TARGET ACCOUNT 2** via grand jury subpoena.  As of May 12, 2017, Patient #1 is listed as the subscriber for the phone number associated with **TARGET ACCOUNT 2**.

95.     Investigators conducted an analysis of the toll records from April 24, 2022, through April 19, 2023.  According to the analysis, there is probable cause to believe that SOUCY has used the cellular phone associated with **TARGET ACCOUNT 1** to call and text individuals to whom he is prescribing controlled substances.

96.     For example, investigators obtained records from Walgreens pharmacy located in Colebrook related to Patient #1 through Patient #5, which contained phone numbers affiliated with each patient.  According to the toll records, SOUCY exchanged calls and texts with these patients as set forth below:

| Patient (Min/Max Date) | Phone number (last four) | Approx.  number of contacts | Approx. number of calls | Approx. number of texts |
|---|---|---|---|---|
| Patient #1 April 28, 2022 – April 19, 2023 | X6773 | 907 | 739 | 168 |
| Patient #2 May 10, 2022 – April 19, 2023 | X8687 | 51 | 40 | 11 |
| Patient #3 May 27, 2022 – April 13, 2023 | X5436 | 29 | 24 | 5 |
| Patient #4 June 6, 2022 – January 25, 2023 | X1189 | 17 | 17 | 0 |
| Patient #5 May 3, 2022 – April 5, 2023 | X1922 | 188 | 68 | 120 |

97.     According to a review of the PDMP and the Verizon subpoena returns, SOUCY appears to communicate with these patients on or around the dates that he issued controlled substance prescriptions for them.  For example, on February 9, 2023, SOUCY, through the cellular

phone associated with **TARGET ACCOUNT 1**, called Patient #2 and spoke to him/her for approximately one minute.  The next day, SOUCY issued Patient #2 a prescription for a 7-day supply of fentanyl 75mcg patches (4 total) (308.57 MME).  From February 12 through February 16, 2023, SOUCY, through the cellular phone associated with **TARGET ACCOUNT 1**, exchanged four texts with Patient #2.  The next day, SOUCY issued Patient #2 a prescription for a 30-day supply of fentanyl 50mcg patches (15 patches total) (180 MME).  Also, on March 29, 2023, through the cellular phone associated with **TARGET ACCOUNT 1**, SOUCY spoke to Patient #2 for approximately twenty-three minutes.  The next day, SOUCY issued Patient #2 a prescription for a 26-day supply of oxycodone HCL 30mg (153 tablets) (176.54 MME).

98.     By way of further example, from March 7 through March 8, 2023, SOUCY, through the cellular phone associated with **TARGET ACCOUNT 1**, exchanged six texts with Patient #5.  On March 8, 2023, SOUCY issued Patient #5 a prescription for 27-day supply oxycodone HCL 20mg (163 tablets) (181.11 MME).

99.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site

data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

100.    Based on my training and experience, I know that Verizon can collect cell-site data about **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2**.  I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.  In your Affiant's training and experience, Verizon typically retains the cell-site data requested in Attachment B1 for a period of one year.

101.    Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the cellular phones associated with **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** and may assist in the identification of co-conspirators and/or victims.

102.    Based upon my experience, training, and knowledge, I know that persons involved in violations of crimes related to the TARGET OFFENSES, such as those described herein, utilize

34

electronic devices, namely cellular telephones to plan, coordinate and conduct their crimes. Evidence of this activity in the form of e-mails (or electronic mail), text messages, and voicemails from "patients", photographs, videos, audio files, messaging "apps" or services, such as WhatsApp and Signal, which are used to communicate with "patients" in an effort to evade detection and prosecution, calendars, diaries, notes, internet browsing entries, searches, and history, location information of the cellular telephone user, such as GPS coordinates, and navigation, is therefore stored within the internal memory of the devices uses. The evidence is often critical to establishing the conduct of the subjects using the devices.

103.    For example, in this circumstance, the location information of the user or users of the cellular phones associated with **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** would assist investigators obtaining evidence to evaluate the veracity of the statements of SOUCY and Patient #1, specifically their denials that they drove from the Colebrook area to Concord seeking to fill opioid prescriptions.

## V.    PROBABLE CAUSE TO BELIEVE EVIDENCE OF THE TARGET OFFENSES IS LOCATED AT THE TARGET LOCATION (NextGen Healthcare).

104.    I know on May 24, 2023, SOUCY told DEA investigators that most of his patient records are stored within a computer. Additionally, I know on multiple occasions SOUCY told DEA investigators that he uses MediTouch by the **TARGET LOCATION** as his EHR software and explained that he pays $608 a month for access to MediTouch.

105.    In general, an EHR is a digital version of a patient's paper medical chart, which includes, among other things, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information. Companies, such as NextGen, give healthcare providers access to EHR software. According to NextGen's website,

the company promotes itself as "an award-winning EHR system from a partner you can count on" and touts that it is the "Ranked #1 EHR". [13]

106.   I am aware of a press release dated March 3, 2018, announcing that Meditouch EHR has been rebranded as NextGen Office.[14]

107.   According to NextGen's website, NextGen Office is described as a "cloud-based EHR and practice management solution."[15]

108.   In my training and experience investigating illegal prescribing, I have learned that electronic health records document both services purportedly provided, the names of the medical or health care professionals providing the purported services, and the purported condition of patients, diagnoses, billing records, as well as progress notes and treatment plans. Such information can be important evidence when attempting to determine which provider purportedly treated a patient or client on a given day, and whether medical conditions actually existed to warrant the services and prescriptions issued.  Administrative logs within the electronic medical record system also indicate whether records were altered to hide fraudulent activities.

109.   In general, providers like NextGen typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins

---

[13] https://www.nextgen.com/ (last visited June 23, 2023).
[14] https://www.avsmedical.com/avsmedical-blog/meditouch-is-now-nextgen-office (last viewed June 23, 2023).
[15] https://www.nextgen.com/solutions/electronic-health-records/small-practices-nextgen-office (last viewed June 23, 2023).

to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the subscriber's account.

110.    Based on the foregoing, there is probable cause to believe that computers and servers located at **TARGET LOCATION** are likely to contain stored EHR and related records associated with SOUCY's NextGen account.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to determine what services were rendered, who rendered the services, and whether the services were medically necessary in light of what has been included in the patients' medical record.

111.    Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities related to the TARGET OFFENSES will be located within the **TARGET LOCATION** (as more fully described in Attachment A2).

## **CONCLUSION**

112.    I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around January 2020 and continuing through the present, in District of New Hampshire and elsewhere, SOUCY has violated Title 21, United States Code, Section 841.

113.    Further, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES, as described below and in Attachments B1 and B2 are located with information associated with **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** maintained by Verizon, and SOUCY's EHR account maintained by the **TARGET LOCATION**.

114.    Therefore, I respectfully request that the Court issue the proposed search warrants. Because the warrants will be served on Verizon and NextGen, who will then compile the requested

records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

115.    Pursuant to 18 U.S.C. § 2703(d), the presence of a law enforcement officer is not required for the service or execution of these warrants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


/s/ Robert Lukacz
Robert Lukacz
Task Force Officer, DEA



Subscribed and sworn to before me

This _____20th_____ day of July, 2023.


_____
HONORABLE ANDREA JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

38

## <u>ATTACHMENT A-2</u>

**Property to be Searched**

This warrant applies to information associated with the account listed ("SUBJECT ACCOUNT") below that are within the possession, custody, or control of NextGen Healthcare (the "PROVIDER"), an electronic health records vendor headquartered at 4075 Sorrento Valley Blvd, San Diego, CA 92121, regardless of where such information is stored, held, or maintained.

|  |  |
|---|---|
| Name: | Robert G. Soucy |
| Address: | 9 Oakes Road, Colebrook, New Hampshire 03576 |

**ATTACHMENT B-2**

**Particular Things to be Seized**

**I.    INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of NextGen (the "PROVIDER"), regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A-2, from November 18, 2020 to June 30, 2023, with respect to the SUBJECT ACCOUNT:

   a.   All records or other information stored by an individual using the SUBJECT ACCOUNT, including:

   i.   All patient clinical files and/or medical records relating to the patients **listed in Exhibit 1**, including, but not limited to, documents and records relating to intake, assessment, clinical documentation, patient visit notes, certification of terminal illness, plan of care, interdisciplinary team ("IDT") meetings, charts, schedules, notes, prescriptions, and electronically signed forms.

   ii.  All records showing the preparation of medical records including, but not limited to, scheduling of employees, timecards, daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the sending or sharing of such documents with other persons or receipt of such documents from other persons.

2

iii. For all the foregoing records, records and data related to the original records, including the identities of the individual that authored the original record, all modifications to any record, and the identities of the individuals who made the modifications to the records.

b. All other records and information, including:

i. All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT.

ii. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dialups, and locations, and

including specifically the specific product name or service to which the connection was made.

II.   **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

For the SUBJECT ACCOUNT listed in Attachment A-2, the search team may seize:

a.      All information described above that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (illegal drug distribution), namely:

iii.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

iv.   Information related to how and when the SUBJECT ACCOUNT was accessed or used.

v.   All clinical files and patient records for the patients **listed in Exhibit 1**.

vi.   All records showing the preparation of medical records, such as daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the mailing or sharing of such documents with other persons or receipt of such documents from other persons for the patients **listed in Exhibit 1**.

vii.   Memoranda, notes, correspondence, lists, logs, ledgers, and other records reflecting payments made, in cash or in kind, or consideration given to any patient **listed in Exhibit 1**.

viii.   All scheduling, client relations management, and marketing records and information pertaining to patients **listed in Exhibit 1**.

4

ix.   All employee management information and records identifying employees, contractors, and volunteers.

### III.   PROVIDER PROCEDURES

IT IS ORDERED that the PROVIDER shall deliver the information within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Diversion Investigator Frank Borelli
Drug Enforcement Administration
Telephone: (617) 733-1932
Email: frank.j.borelli@dea.gov

IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

IT IS FURTHER ORDERED that the PROVIDER shall produce all files in their original, unchanged, native file formats[16] and provide detailed instructions enough to enable law enforcement and/or those assisting law enforcement to access and retrieve the information described above.  If the files are not capable of being translated into a commercially available program, the PROVIDER shall produce any software, software manuals, and instructions to enable law enforcement and/or those assisting law enforcement to access the information described above in Section I.

---

[16] The following is a non-exhaustive list of examples of native file formats: Microsoft Excel, Microsoft Access, Microsoft Outlook, Microsoft Word, Corel Word Perfect, and Adobe PDF.

**Exhibit 1: Particular Patient Files to be Seized**

| | Patient Name | Date of Birth |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC<br>RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE<br>902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by NextGen, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of [**PROVIDER**].  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of NextGen, and they were made by NextGen as a regular practice; and

b.      such records were generated by NextGen's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of NextGen in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by NextGen, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of

the Federal Rules of Evidence.

_____        _____

Date                                    Signature

2